No. 26-2806

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**

SPACEXAI LLC,

PLAINTIFF-APPELLANT,

v.

KEITH ELLISON, in his official capacity as
Attorney General of Minnesota,

DEFENDANT–APPELLEE.

On Appeal from the United States District Court
for the District of Minnesota
Honorable Judge Donovan W. Frank, District Judge
(0:26-cv-03425)

# BRIEF OF AMICI CURIAE AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA IN SUPPORT OF PLAINTIFF–APPELLANT AND REVERSAL


Teresa Nelson
AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA
P.O. Box 14720
Minneapolis, MN 55414
Tel.: (651) 645-4097
Email: tnelson@aclu-mn.org

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
Tel.: (202) 715-0816
Email: cvenzke@aclu.org

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amici curiae American Civil Liberties Union and American Civil Liberties Union of Minnesota state that they do not have a parent corporation and that no publicly held corporation owns 10% or more of their stock.

Dated: November 12, 2026

By: *<u>/s/ Cody Venzke</u>*
Cody Venzke

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

STATEMENT OF INTEREST .......... 1

SUMMARY OF THE ARGUMENT .......... 3

ARGUMENT .......... 6

I. HF 1606 Sweeps in a Substantial Amount of Constitutionally Protected Speech by Online Speakers .......... 6

A. The Use of AI-Generated Nudity by Political Speakers, Content Creators, and Traditional Artists Are Beyond Minnesota's Interest in Regulating NCII .......... 6

B. The Use of Generative AI By an Individual to Create Content Does Not Deprive the Resulting Speech of Its Protected Status .......... 13

II. HF 1606 Lacks Safeguards Included in Other NCII Laws and Consequently Fails Strict Scrutiny .......... 15

A. HF 1606 Lacks Crucial Safeguards Included in Other NCII Laws, Including in Minnesota, that Ensure They Are Narrowly Tailored to the Government's Interest .......... 16

B. HF 1606 Is Content Based .......... 18

C. HF 1606 Is Not Narrowly Tailored and Fails Strict Scrutiny .......... 20

C. A Less Restrictive Alternative Would At Least Include a Mental State, Exempt Consensual Imagery and Exempt Imagery in the Public Interest .......... 25

III. First Amendment Harms Are Not Reparable, Even for Commercial Speakers .......... 27

CONCLUSION .......... 28

CERTIFICATE OF COMPLIANCE .......... 29

CERTIFICATION OF COMPLIANCE WITH EIGHTH CIRCUIT RULE 28A(H) .....30

CERTIFICATE OF SERVICE .....31

## TABLE OF AUTHORITIES

**Cases**

*ACA Connects v. Frey*,
471 F. Supp. 3d 318 (D. Me. 2020) ........................................ 1

*ACLU et al. v. Clearview AI*,
2020 CH 04353 (Ill. Cir. Ct. 2022) ........................................ 1

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ........................................ 14

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ........................................ 18, 19

*Baker Electrical Cooperative., Inc. v. Chaske*,
28 F.3d 1466 (8th Cir. 1994) ........................................ 28

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) ........................................ 3, 14

*Chiles v. Salazar*,
607 U.S. 627 (2026) ........................................ 3

*Chu Drua Cha v. Noot*,
696 F.2d 594 (8th Cir. 1982) ........................................ 28

*Counterman v. Colorado*,
600 U.S. 66 (2023) ........................................ 4, 20, 26

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ........................................ 18

*Elrod v. Burns*,
427 U.S. 347 (1976) ........................................ 5, 27

*Erznoznik v. City of Jacksonville*,
422 U.S. 205 (1975) ........................................ 14, 18, 19, 24

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025) ........................................ 3, 4

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... 21

*Jackson v. Thomson Reuters America Corp.*,
No. 25-2121, 2026 WL 3211190 (4th Cir. Oct. 27, 2026) .......... 21

*Jenkins v. Georgia*,
418 U.S. 153 (1974) .......... 19

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) .......... 13

*Miller v. California*,
413 U.S. 15 (1973) .......... 19

*Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*,
460 U.S. 575 (1983) .......... 15

*Mishkin v. New York*,
383 U.S. 502 (1966) .......... 21

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 3, 13, 14, 15

*NetChoice v. Moody*,
144 S. Ct. 478 (2023) .......... 1

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 21

*People v. Austin*,
155 N.E.3d 439 (Ill. 2019) .......... 18

*Phelps-Roper v. Nixon*,
509 F.3d 480 (8th Cir. 2007) .......... 27

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 19

*Regan v. Time, Inc.*,
468 U. S. 641 (1984) .......... 19

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 1, 3, 14

*Riley v. National Federation of the Blind of North Carolina, Inc.*,
487 U.S. 781 (1988) .......... 13

*Sable Communications, Inc. v. Federal Communications Commission*,
492 U.S. 115 (1989) .......... 20

*Smith v. California*,
361 U.S. 147 (1959) .......... 7, 21

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 4

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 3

*Stark v. Patreon, Inc.*,
656 F. Supp. 3d 1018 (N.D. Cal. 2023) .......... 1

*State v. Casillas*,
952 N.W.2d 629 (Minn. 2020) .......... *passim*

*State v. Katz*,
179 N.E.3d 431 (Ind. 2022) .......... 18, 20

*State v. Muccio*,
890 N.W.2d 914 (Minn. 2017) .......... 17

*State v. VanBuren*,
214 A.3d 791 (2019) .......... 18, 24

*State v. Zitterkopf*,
9 N.W.3d 896 (Neb. 2024) .......... 18

*Time, Inc. v. Firestone,*
424 U.S. 448 (1976) .......... 10

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000) .......... 14, 18, 19, 20

*United States v. Stevens*,
559 U.S. 460 (2010)....................................................................................20

*United States v. X-Citement Video, Inc.*,
513 U.S. 64 (1994)......................................................................................21

*Welty v. Dunaway*,
No. 25-5738, 2026 WL 2874671 (6th Cir. Sept. 24, 2026)..................................8

**Statutes**

13 Vt. Stat. Ann. § 2606 ..............................................................................16

720 Ill. Comp. Stat. 5/11-23.5........................................................................16

Ind. Code § 35-45-4-8....................................................................................16

Minn. Stat. § 604.32.......................................................................... 5, 16, 17

Minn. Stat. § 609.341........................................................................ 7, 20, 23

Minn. Stat. § 617.261........................................................................ 5, 16, 17

Neb. Rev. Stat. § 28-311.08..........................................................................16

**Other Authorities**

Abner Li, *YouTube Shorts Will Use AI to Make Avatars That Look and Sound Like You*, 9to5Google (Apr. 8, 2026), https://perma.cc/46KX-JJQL......11

*AI Creators Captured 12% of OnlyFans New Accounts in 2025*, OnlyFans Stats. (Oct. 21, 2026), https://perma.cc/AJ54-73T4...........................................11

*Hegseth Tired of Looking at All These Limp Dicks in Pentagon Locker Room*, Duffel Blog (Sept. 14, 2026), https://perma.cc/THD2-V6C3...................9

Helen Reid, *Fashion's AI Era: Face Swaps and Digital Clones*, Reuters (Oct. 29, 2026), https://perma.cc/5KU4-2ZBH ..................................................12

*How We Made This Decision*, Threads, https://perma.cc/F3TU-X4CP (last visited Nov. 11, 2026)..........................................................................10

Illma Gore, *If Anyone Is Going to Be Threatened By a Small Penis, It's Trump*, The Guardian (May 7, 2016), https://perma.cc/HV2L-SHHT.................8

Image posted by Rob Evans (@rob.evans.370), Threads (July 18, 2026), https://www.threads.com/share/FvNSTDHj2 .....................................................9

Jordan Kranse, *Inside the Tech That Makes AI Body Doubles for Hollywood Stars*, Wall St. J. (Dec. 21, 2023), https://www.wsj.com/video/series/in-depth-features/inside-the-tech-that-makes-ai-body-doubles-for-hollywood-stars/F0584BEC-8ADF-4B5C-BA0A-CEF42039EB52 .................12

Lorenzo Tondo, *'Think Before Sharing,' Giorgia Meloni Says As AI-Made Lingerie Image of Her Goes Viral*, The Guardian (May 5, 2026), https://perma.cc/FLS4-X259 .........................................................................10

Matt Burgess & Maddy Varner, *Grok Is Pushing AI 'Undressing' Mainstream*, Wired (Jan. 6, 2026), https://perma.cc/V4KC-89FJ .....................23

Matt Burgess, *An AI Image Generator's Exposed Database Reveals What People Really Used It For*, Wired (Mar. 31, 2025), https://perma.cc/NVR5-A2HF .................................................................... 26, 27

Matt Burgess, *Hugging Face Has a Deepfake Nudes Problem*, Wired (July 28, 2026), https://perma.cc/6SDL-BAHY .........................................................27

Matt Burgess, *Hundreds of Mundane AI Apps Are Hiding Sexually Abusive Deepfake Features*, Wired (Nov. 2, 2026), https://perma.cc/6PLA-NREC 22, 26

Matt Burgess, *Sexually Explicit Deepfake Sites Target 100-Plus Politicians in Europe*, Wired (Sept. 14, 2026), https://perma.cc/5JWN-MVJ5 ...................10

Minn. Stat. § 609.343 ..........................................................................................23

*Nonconsensual Pornography (Revenge Porn) Laws in the United States*, Ballotpedia, https://perma.cc/KB6P-359D .......................................................16

*Pete Hegseth Walks Fully Nude Around Newly Press-Free Pentagon*, The Onion (Oct. 17, 2025), https://perma.cc/XW7Z-44EC ........................................9

Peter Holley, *These Protesters Wanted to Humiliate 'Emperor' Trump. So They Took Off His Clothes.*, Wash. Post (Aug. 19, 2016), https://perma.cc/YZ42-UKUR.........................................................................8

Post by Cathy Zhao (@whatsupcathyz69), X (Jan. 2, 2026), https://perma.cc/M3BP-FY7Y ......................................................................11

Post by Jess (@itsjessamarin), X (Jan. 7, 2026), https://perma.cc/VHX4-53GD ....................................................................................... 11

Post by Sophie Rain (@sophieraiin), X (Dec. 30, 2025), https://perma.cc/63ZR-4XQ5 ....................................................................... 11

Rebecca Umbach et al., *AI-Generated Image-Based Sexual Abuse: Perpetration and Consumption Across Three Regions*, 179 Computers in Human Behavior 108935 (2026), https://perma.cc/7EHY-9432........................ 26

Reece Rogers, *Google Makes It Easy to Deepfake Yourself*, Wired (May 19, 2026), https://perma.cc/ZR4C-8JZY ................................................................... 11

*This Content Isn't Available to Everyone*, Threads, https://perma.cc/3TL4-9BNK (last visited Nov. 11, 2026) .................................................................. 10

Video posted by Keith Ellison, Facebook, *Minnesota Takes on XAI*, (Aug. 19, 2026), https://www.facebook.com/reel/1599741185149740 ......................... 6

Vittoria Elliot & Matt Burgess, *Meta Ran Ads for an App That Promised to Nudify Female Politicians*, Wired (Aug. 18, 2026), https://perma.cc/K5R8-SJSQ ..................................................................... 22, 26

Vittoria Elliot, *Massive Effigy of Elon Musk Raised Over Times Square to Protest Grok*, Wired (June 11, 2026), https://perma.cc/L4C3-JJGK ................... 9

## STATEMENT OF INTEREST[1]

The American Civil Liberties Union ("ACLU") is a nationwide, nonprofit organization that since 1920 has sought to protect the civil liberties guaranteed by the U.S. Constitution, including the right to freedom of speech. The ACLU of Minnesota ("ACLU-MN") is a state affiliate of the ACLU. The ACLU and its affiliates have frequently appeared as both counsel and amici in cases to defend the First Amendment rights of people to speak online. *See, e.g., Reno v. ACLU*, 521 U.S. 844 (1997) (counsel); *NetChoice v. Moody*, 144 S. Ct. 478 (2023) (amicus). Both organizations have also defended privacy protections from unfounded attacks. *See, e.g., ACA Connects v. Frey*, 471 F. Supp. 3d 318 (D. Me. 2020) (amicus); *ACLU et al. v. Clearview AI*, 2020 CH 04353 (Ill. Cir. Ct. 2022) (counsel); *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018 (N.D. Cal. 2023) (amicus). The ACLU and ACLU-MN are equally committed to the rights and protection of survivors of gender-based violence, the vast majority of whom are women, and have long worked to eliminate barriers to women's full equality.

As fervent defenders of speech, privacy, and gender equality, both organizations have a strong interest in the proper resolution of this case. Amici

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amici certify that no person or entity, other than amici curiae, their members, or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part. Pursuant to Federal Rule of Appellate Procedure 29(a)(2), counsel for amici curiae received consent from all parties to file this brief.

submit this brief to highlight two crucial considerations for this Court: First, on the merits — should this Court choose to reach them — HF 1606 sweeps more broadly than other laws regulating non-consensual intimate images ("NCII") of adults. It covers images regardless of their consensual creation and lacks crucial safeguards to exempt matters of public interest. Second, the district court erred in concluding that xAI suffered no irreparable harm to its First Amendment rights because it is a "commercial" entity.

## SUMMARY OF THE ARGUMENT

The First Amendment requires that when the government regulates speech, it bears the burden of justifying its restrictions and it must regulate narrowly. Outside of a handful of long-standing, historic exceptions for categorically unprotected speech, the government must demonstrate that the measures it adopts are "narrowly tailored" to a sufficiently important or compelling governmental interest.
*Chiles v. Salazar*, 607 U.S. 627, 640 (2026); *accord Free Speech Coal., Inc. v. Paxton*, 606 U.S. 461, 471 (2025). These "basic principles of the First Amendment do not vary" in the face of "ever-advancing technology," *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (quotation marks omitted) (quoting *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011)), including the use of AI by individuals to generate expressive content, or when the government acts to protect privacy or other interests, *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011); *Moody*, 603 U.S. at 732; *Reno*, 521 U.S. at 863 n.30.

This appeal presents a simple question: has Minnesota carried its burden to ensure that HF 1606's restriction of speech is narrowly tailored to its interest in addressing the harms of AI-generated non-consensual intimate imagery ("NCII")? The answer is no. There is no denying the significant psychological, safety, and reputational harms caused by NCII, both real and AI-generated, and those concerns

very likely give rise to a compelling governmental interest. *See State v. Casillas*, 952 N.W.2d 629, 642 (Minn. 2020).

But Minnesota has not ensured that its law is narrowly tailored to serve that interest. HF 1606 lacks crucial safeguards that have long been demanded from laws restricting speech: an applicable mental state above strict liability, *Counterman v. Colorado*, 600 U.S. 66, 75–78 (2023) (cataloging mental states required for defamation, incitement, obscenity, and true threats); a concrete specification of the prohibited speech, *Free Speech Coal.*, 606 U.S. at 472; accommodations for matters of public interest, *Snyder v. Phelps*, 562 U.S. 443, 452 (2011); and carveouts for consensual imagery.

Together, the omission of these safeguards causes HF 1606 to sweep in constitutionally protected speech far afield of the harms that motivated the law. Perhaps most crucially, HF 1606 would sweep in commentary on matters of public interest, including satirical depictions of politicians. The bill also would cover AI images made with consent, including images that online content creators post of themselves or that are made as part of a movie production. And the harms of these omissions are further compounded by HF 1606's broad definition of "intimate part" — including the "inner thigh," "buttocks," and "breast of a human being" — which would sweep in both non-nudity and nudity not ordinarily considered "intimate."

The safeguards omitted by HF 1606 have been crucial for courts that have upheld other NCII laws, including Minnesota's two already enacted laws. Minn. Stat. § 617.261 (regulating NCII generally); *id.* § 604.32 (regulating deepfake NCII). In concluding that the state's existing general NCII law was narrowly tailored, the Minnesota Supreme Court expressly relied on those safeguards embodied in the statute: an intentional mental state, an "explicitly defined [] type of image that is criminalized," carveouts for matters of public interest, and a requirement that images be non-consensual. *Casillas*, 952 N.W.2d at 643.

As a content-based law, HF 1606 can only survive strict scrutiny if it is narrowly tailored to the state's interest. Given its omission of safeguards regarding an applicable mental state, a concrete definition of the proscribed imagery, matters of public interest, and lack of consent, it is not.

Separately, the district court erred in concluding that, because xAI is a "commercial" entity, its First Amendment harms are reparable. But the Supreme Court has been clear: "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

For these reasons, the district court's denial of a preliminary injunction should be vacated and the case remanded.

## ARGUMENT

### I. HF 1606 SWEEPS IN A SUBSTANTIAL AMOUNT OF CONSTITUTIONALLY PROTECTED SPEECH BY ONLINE SPEAKERS.

#### A. The Use of AI-Generated Nudity by Political Speakers, Content Creators, and Traditional Artists Are Beyond Minnesota's Interest in Regulating NCII.

Although HF 1606 is labeled a "nudification" law nominally aimed at ensuring that "no one should have their likeness nudified and used to exploit or harass them,"[2] it regulates speech far beyond that state interest. Nothing in the law requires that images be *non*-consensual, imposes a *mens rea* requirement, or exempts matters of public interest. These omissions are compounded by the broad definition of "intimate parts," which sweeps in body parts that may not be considered "intimate" at all.

HF 1606 prohibits the "nudification" of images of an identifiable individual; "nudification" is defined as the process by which an image or video is "altered or generated to depict an intimate part not depicted in an original unaltered image or video of an identifiable individual," such that "the altered or generated image or video is so realistic that a reasonable person would believe that the intimate part belongs to the identifiable individual." HF 1606, sec. 1, subdiv. 1(d). "Intimate parts" is defined as "the primary genital area, groin, inner thigh, buttocks, or breast

---

[2] Video posted by Keith Ellison, Facebook, *Minnesota Takes on XAI* (Aug. 19, 2026), https://www.facebook.com/reel/1599741185149740.

of a human being." Minn. Stat. § 609.341, subdiv. 5 (incorporated in HF 1606). HF 1606 does not specify an applicable mental state for any of its elements.

Taken together, HF 1606's omission of several crucial safeguards causes it to extend beyond the state's asserted interest in protecting privacy. Nothing in the law requires that images be made *without* consent — a significant expansion in a law aimed at combatting non-consensual intimate imagery. Moreover, the law lacks a requirement that platforms act with a mental awareness or appreciation of the risk that images are being created without consent — a strict liability regime that the Supreme Court has long rejected for regulation of speech. *Smith v. California*, 361 U.S. 147, 152 (1959) (requiring showing of *scienter* to penalize distribution of obscenity). And, unlike other NCII laws, it does not include an exception for matters of public interest. The law's reach is compounded by the definition of "intimate parts," which would restrict some images of body parts that are regularly visible to others in public settings.

The net effect of these omissions causes HF 1606 to sweep in speech far outside its purported focus: political speech, self-generated images by online content creators, and the use of AI by traditional media institutions like film studios. Although perhaps not the images that motivated the law's drafters, "[t]here is

nothing in the statute to stop this prosecution." *Welty v. Dunaway*, No. 25-5738, 2026 WL 2874671, at *15 (6th Cir. Sept. 24, 2026). For example:

**HF 1606 covers matters of public interest:** Non-pornographic depictions of politicians and public figures in various states of undress are used to comment on their policies and positions. For example, statues appeared during the first Trump administration depicting the President naked and with small genitalia,[3] seemingly criticizing the overtly masculine stances and tenor of the administration. Similarly, when artist Illma Gore created a viral painting of President Trump — also with small genitalia — Gore expressly connected it with larger themes of gender identity. Gore explained, "I wanted to raise questions about how we think about gender: if I painted Trump with a massive penis, why would we then take it as a signal that he is powerful? Why would a small penis be viewed as effeminate? And what is wrong with effeminacy to begin with?"[4]

And activists protesting Elon Musk's laissez-faire approach to the very technology at issue in this litigation raised a massive bust of Musk, prominently

---

[3] Peter Holley, *These Protesters Wanted to Humiliate 'Emperor' Trump. So They Took Off His Clothes.*, Wash. Post (Aug. 19, 2016), https://perma.cc/YZ42-UKUR.
[4] Illma Gore, *If Anyone Is Going to Be Threatened By a Small Penis, It's Trump*, The Guardian (May 7, 2016), https://perma.cc/HV2L-SHHT. Gore recounts being threatened with copyright proceedings and right of publicity suits.

featuring his exposed breasts.[5] Had those statues instead been AI-generated images, they would be proscribable under HF 1606.

Similarly, potentially AI-generated images have been used online to lampoon Secretary of Defense Pete Hegseth, his policies, and his perceived fixation on masculinity and the physical appearance and vigor of service members. One photorealistic image posted by the Onion, addressing Hegseth's efforts to restrict the Pentagon press corps, features a naked Hegseth from the waist-up in a Pentagon office with the headline "Pete Hegseth Walks Fully Nude Around Newly Press-Free Pentagon."[6] Another realistic image, published on a satirical military blog and taking on Hegseth's proposal to test soldiers' testosterone levels, depicts a shirtless Hegseth in a locker room, evidently examining another man's genitalia.[7] And finally, one online user, responding to the same testing policy, posted a photo of Hegseth in a pink tutu, with his upper chest and inner thigh exposed, drinking from a whiskey bottle.[8] (During the course of writing this brief, that final image was unavailable to some users, with an accompanying explanation, "We received a legal request to

---

[5] Vittoria Elliot, *Massive Effigy of Elon Musk Raised Over Times Square to Protest Grok*, Wired (June 11, 2026), https://perma.cc/L4C3-JJGK.
[6] *Pete Hegseth Walks Fully Nude Around Newly Press-Free Pentagon*, The Onion (Oct. 17, 2025), https://perma.cc/XW7Z-44EC.
[7] *Hegseth Tired of Looking at All These Limp Dicks in Pentagon Locker Room*, Duffel Blog (Sept. 14, 2026), https://perma.cc/THD2-V6C3.
[8] Image posted by Rob Evans (@rob.evans.370), Threads (July 18, 2026), https://www.threads.com/share/FvNSTDHj2/.

restrict this content. . . . After the review, we restricted access to the content in the location where it goes against local law."[9])

Although perhaps crude, there can be little doubt that these images directly address matters of public interest: the tone of the administration and the policies and leadership of our military.[10]

**HF 1606 covers self-generated imagery:** The law would also impact online speakers and content creators by broadly criminalizing sexual or self-expressive speech about themselves. HF 1606 reaches depictions of the "inner thigh" or the "breast," without regard to other considerations such as the consent of the depicted

[9] *See This Content Isn't Available to Everyone*, Threads, https://perma.cc/3TL4-9BNK (last visited Nov. 11, 2026); *How We Made This Decision*, Threads, https://perma.cc/F3TU-X4CP (last visited Nov. 11, 2026).

[10] Not every AI-generated depiction of a politician unclothed is necessarily a matter of public interest, as not every matter involving the lives of public officials or public figures is a matter of public interest entitled to heightened First Amendment protection. In *Time, Inc. v. Firestone*, the Supreme Court explained that matters of public interest will involve "especial prominence in the affairs of society" and being at the "forefront of particular public controversies in order to influence the resolution of the issues involved." 424 U.S. 448, 453 (1976) (citation omitted). Consequently, the controversy — a celebrity divorce that became a "cause celebre" — was not one of "public interest," even though it was "of interest to the public." *Id.* at 454. In this same vein, AI-generated depictions of politicians — nearly all of whom were women — wearing lingerie while reclining on a bed or engaging in explicit conduct likely do not address a matter of public concern. *See* Matt Burgess, *Sexually Explicit Deepfake Sites Target 100-Plus Politicians in Europe*, Wired (Sept. 14, 2026), https://perma.cc/5JWN-MVJ5; Lorenzo Tondo, *'Think Before Sharing,' Giorgia Meloni Says As AI-Made Lingerie Image of Her Goes Viral*, The Guardian (May 5, 2026), https://perma.cc/FLS4-X259.

individual. This would subject the creation of content by online influencers, artists, actors, and others who produce self-generated AI depictions *of themselves* to liability under the law. Multiple examples exist in which content creators have prompted xAI's Grok and other AI models to create images of themselves in bikinis or other revealing clothing.[11] Self-generated AI content has become a burgeoning corner of the pornography industry, with one market watcher estimating that "AI-assisted" creators made up 12 percent of new accounts on the Only Fans platform in 2025.[12] And an increasing number of tools are designed to allow people to create AI-generated images of themselves.[13]

**HF 1606 covers artistic uses of AI:** In the same vein, consensual uses of AI have been deployed in more traditional artistic endeavors. Film studios have deployed generative AI to realistically create AI body doubles for actors and

---

[11] Post by Cathy Zhao (@whatsupcathyz69), X (Jan. 2, 2026), https://perma.cc/M3BP-FY7Y; Post by Jess (@itsjessamarin), X (Jan. 7, 2026), https://perma.cc/VHX4-53GD; Post by Sophie Rain (@sophieraiin), X (Dec. 30, 2025), https://perma.cc/63ZR-4XQ5.

[12] *AI Creators Captured 12% of OnlyFans New Accounts in 2025*, OnlyFans Stats. (Oct. 21, 2026), https://perma.cc/AJ54-73T4.

[13] Abner Li, *YouTube Shorts Will Use AI to Make Avatars That Look and Sound Like You*, 9to5Google (Apr. 8, 2026), https://perma.cc/46KX-JJQL; Reece Rogers, *Google Makes It Easy to Deepfake Yourself*, Wired (May 19, 2026), https://perma.cc/ZR4C-8JZY.

others, including for nude or revealing scenes.[14] The creation of digital twins is also becoming increasingly common in the fashion industry.[15]

Proponents of HF 1606 might argue these examples fall outside the law's ambit because the photos must be "realistic" and because the "intimate part" must "not [be] depicted in an original unaltered image or video." Or they might contend that the law exempts images that require "technical skill" to create.

But these purported limitations do not address the broad scope of the law's reach and will place courts in the untenable position of adjudicating when an image is sufficiently realistic to fall within the statute's ambit, or whether context matters in assessing realism. Likewise, the law only applies to a depiction of an "intimate part not depicted in an original unaltered image," seemingly assuming that deepfakes will be based on reference images, which is not always the case. Will courts be required to identify the reference image? Will *any* prior display of an individual's cleavage, nipples, inner thigh, buttocks, or other "intimate parts" constitute a "depict[ion] in an original unaltered image or video"? Would such a prior display serve to remove *all* deepfakes of that individual from HF 1606's

---

[14] Jordan Kranse, *Inside the Tech That Makes AI Body Doubles for Hollywood Stars*, Wall St. J. (Dec. 21, 2023), https://www.wsj.com/video/series/in-depth-features/inside-the-tech-that-makes-ai-body-doubles-for-hollywood-stars/F0584BEC-8ADF-4B5C-BA0A-CEF42039EB52.
[15] Helen Reid, *Fashion's AI Era: Face Swaps and Digital Clones*, Reuters (Oct. 29, 2026), https://perma.cc/5KU4-2ZBH.

scope — or just images that expressly reference the prior image? Moreover, would sufficiently structured AI prompts specifying framing, image dimensions, lens length, and focal depth constitute "technical skill"? The ACLU does not take a position on how those questions *should* be answered as a matter of constitutional law or statutory interpretation but flags them for the significant and difficult issues they present for courts.

Even if courts could eventually resolve these questions, they are sufficiently ambiguous to chill platforms from creating sexual content that could fall within HF 1606's ambit. *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 793–94 (1988) ("Speakers, however, cannot be made to wait for 'years' [for courts to define 'reasonableness'] before being able to speak with a measure of security.") These purported limitations magnify, rather than limit, HF 1606's broad sweep.

### B. The Use of Generative AI By an Individual to Create Content Does Not Deprive the Resulting Speech of Its Protected Status.

Nor do the images discussed above lose their status as protected speech merely because AI was used in their creation. The Supreme Court has been emphatic: "Whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of the First Amendment do not vary." *Moody*, 603 U.S. at 733 (cleaned up). And it has reiterated that point, sometimes almost verbatim, for each generation of technology, from motion pictures, *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 503 (1952), and drive-in movies, *Erznoznik v. City of*

*Jacksonville*, 422 U.S. 205, 208 (1975), to cable television, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 815 (2000), the internet, *Reno*, 521 U.S. at 870, video games, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011), and social media, *Moody*, 603 U.S. at 733.

Concomitant with the Court's commitment to preserving First Amendment freedoms with changing technology, courts have emphasized that the method of speaking cannot deprive speech of its protected status. In *Anderson v. City of Hermosa Beach*, the Ninth Circuit concluded that, just as a tattoo is "pure expression" composed of "words [and] realistic or abstract images [or] symbols," so too is the *process* of tattooing. 621 F.3d 1051, 1060 (9th Cir. 2010). The Ninth Circuit reasoned:

> [N]either the Supreme Court nor our court has ever drawn a distinction between the process of creating a form of pure speech (such as writing or painting) and the product of these processes (the essay or the artwork) in terms of the First Amendment protection afforded. Although writing and painting can be reduced to their constituent acts, and thus described as conduct, we have not attempted to disconnect the end product from the act of creation.

*Id.* at 1061–62. The Supreme Court has agreed: The use of a specific tool for creating speech does not deprive the speech of its protection, nor may the government insert itself into the process of creating speech to purportedly regulate pure conduct. *Accord Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S.

575, 582 (1983) (tax on "components" of newspaper printing "like ink and paper" "singled out the press for special treatment").

The Supreme Court has applied this principle to algorithmic technology and AI. In holding that neither Texas nor Florida could impose political "balancing" requirements on social media platforms, the Court emphasized: "Despite the relative novelty of the technology before us, the main problem in this case — and the inquiry it calls for — is not new." *Moody*, 603 U.S. at 727–28. The use of new technology to accomplish traditional First Amendment "expressive activity" does not alter the application of longstanding principles. *Id.* at 728.

## II. HF 1606 LACKS SAFEGUARDS INCLUDED IN OTHER NCII LAWS AND CONSEQUENTLY FAILS STRICT SCRUTINY.

HF 1606 is a content-based law that is subject to — and fails — strict scrutiny. Given the significant harms imposed by NCII, including AI-generated imagery, Minnesota very likely has a compelling interest in addressing those harms. But HF 1606 is not narrowly tailored to achieve that interest. In contrast with other NCII laws — including in Minnesota — it imposes liability without regard to a culpable mental state, does not require that images be non-consensual, and does not exempt matters of public interest, all of which is compounded by its broad definition of "intimate parts." Consequently, HF 1606 does not pass constitutional muster.

### A. HF 1606 Lacks Crucial Safeguards Included in Other NCII Laws, Including in Minnesota, that Ensure They Are Narrowly Tailored to the Government's Interest.

HF 1606 is not the first effort proffered by states to address the harms posed by NCII. *See, e.g.*, 720 Ill. Comp. Stat. 5/11-23.5(b); Ind. Code § 35-45-4-8; Neb. Rev. Stat. § 28-311.08(3); Minn. Stat. § 617.261; 13 Vt. Stat. Ann. § 2606.[16] Nor is HF 1606 the first state law regulating NCII to be subject to First Amendment scrutiny. Although those laws have largely survived First Amendment scrutiny, they have done so because of significant safeguards to ensure the laws are narrowly tailored to guard against non-consensual invasions of privacy. And HF 1606's omission of adequate safeguards means that it is not narrowly tailored.

Such safeguards are central to Minnesota's two existing NCII laws, one of which has consequently passed strict scrutiny. Minn. Stat. § 617.261 (regulating NCII generally); *id.* § 604.32 (regulating AI-generated NCII). Both statutes are premised — as they must be — on a culpable mental state, with one statute criminalizing *intentional* dissemination of an intimate photo without consent, *id.* § 617.261, and the other creating a civil action for *knowing* dissemination of a non-consensual deepfake, *id.* § 604.32. Both laws specifically circumscribe the "intimate parts" covered by the law as "the genitals, pubic area, or anus of an individual, or if

[16] *See Nonconsensual Pornography (Revenge Porn) Laws in the United States*, Ballotpedia, https://perma.cc/KB6P-359D (last visited Nov. 4, 2026).

the individual is female, a partially or fully exposed nipple." Minn. Stat. § 617.261, subdiv. 7(e); *cf. id.* § 604.32, subdiv. 1(d) (omitting the limitation that an exposed nipple must belong to a female individual). And under both laws, the individual disseminating the image must know that the depicted individual did not consent to the dissemination. Minn. Stat. § 617.261, subdiv. 1(2) (also including "reasonably should know"); *id.* § 604.32, subdiv. 2(a)(1).

The laws also contain significant exceptions for investigating unlawful conduct, exposure in public or for commercial uses, matters of public interest, and legal proceedings. Minn. Stat. § 617.261, subdiv. 5; *id.* § 604.32, subdiv. 6.

These safeguards were crucial to the Minnesota Supreme Court upholding the general NCII law, Minn. Stat. § 617.261. The court concluded that key definitions, including "intimate parts," were "expressly defined." *Casillas*, 952 N.W.2d at 643. The court also found the intentional *mens rea* necessary in narrowing the statute, reasoning:

> [An intentional] *mens rea* requirement means that a defendant must knowingly and voluntarily disseminate a private sexual image; negligent, accidental, or even reckless distributions are not proscribed. This specific intent requirement further narrows the statute and keeps it from "target[ing] broad categories of speech."

*Id.* (quoting *State v. Muccio*, 890 N.W.2d 914, 928 (Minn. 2017)). In addition to requiring a lack of consent, the law exempted matters of public interest, consequently covering only "[s]peech on matters of purely private concern," which

"'is of less First Amendment concern' than speech on public matters that go to the heart of our democratic system." *Id.* at 644 (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985)).

Other courts have agreed that the combination of these safeguards is crucial in ensuring that NCII laws were narrowly tailored. *State v. Zitterkopf*, 9 N.W.3d 896, 912 (Neb. 2024) (analyzing the definition of proscribed images, *mens rea*, and lack of consent); *State v. Katz*, 179 N.E.3d 431, 460 (Ind. 2022); *State v. VanBuren*, 214 A.3d 791, 812 (2019); *cf. People v. Austin*, 155 N.E.3d 439, 464–65 (Ill. 2019) (same, under intermediate scrutiny).

HF 1606 lacks those safeguards, and its lack of tailoring is fatal to its constitutionality, as described below.

**B. HF 1606 Is Content Based.**

HF 1606 is unconstitutional as a content-based regulation of protected non-obscene speech that is not narrowly tailored to its stated purpose — redressing malicious, harmful invasions of privacy. See *Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004).

The law sweeps in speech that is fully protected by the First Amendment — including non-obscene images of adult nudity or adults in various states of undress. *Playboy*, 529 U.S. at 811; *Erznoznik*, 422 U.S. at 213. After all, "nudity alone is not enough to make material legally obscene," *Jenkins v. Georgia*, 418 U.S. 153, 161

(1974), and nothing in the bill is limited to constitutional obscenity. *Cf. Miller v. California*, 413 U.S. 15, 24 (1973) (obscenity must appeal to the "prurient interest" under "contemporary community standards" and lack "serious literary, artistic, political, or scientific value" when "taken as a whole").

HF 1606 seeks to regulate non-obscene speech based on its content — namely, the inclusion in the image of nudity (or near-nudity), under the expansive definitions in the law. "[T]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Reed v. Town of Gilbert*, 576 U.S. 155, 169 (2015) (internal citations omitted); *Ashcroft*, 542 U.S. at 660. Such prohibitions and regulations "cannot be tolerated under the First Amendment." *Regan v. Time, Inc.*, 468 U. S. 641, 648–49 (1984) (citations omitted).

The Supreme Court has directed that restricting speech based on its "sexually explicit" (but non-obscene) or "indecent" nature is content based. *Playboy*, 529 U.S. at 811. Under such regulations, "The speech in question is defined by its content; and the statute which seeks to restrict it is content based." *Id.*; *accord Erznoznik*, 422 U.S. at 211 (prohibition on showing "nudity, however innocent or even educational" held to be content-based). The same is true of HF 1606, which regulates images and videos based on whether they include "the primary genital area, groin, inner thigh, buttocks, or breast of a human being." Minn. Stat. § 609.341 (incorporated in HF

1606). Other courts have agreed that laws classifying images based on "sexual activity and nudity" are "plainly a content-based restriction." *State v. Katz*, 179 N.E.3d 431, 455 (Ind. 2022). HF 1606 is consequently content-based and subject to strict scrutiny.

**C. HF 1606 Is Not Narrowly Tailored and Fails Strict Scrutiny.**

As a content-based prohibition of protected, non-obscene speech, HF 1606 is "'presumptively invalid,' and the Government bears the burden to rebut that presumption." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *Playboy*, 529 U.S. at 817). HF 1606 "can stand only if it satisfies strict scrutiny." *Playboy*, 529 U.S. at 813 (citing *Sable Commc'ns, Inc. v. Fed. Commc'ns Comm'n*, 492 U.S. 115, 126 (1989)). Under strict scrutiny, the prohibition or regulation "must be narrowly tailored to promote a compelling Government interest" which cannot be served through a "less restrictive alternative." *Playboy*, 529 U.S. at 813.

Here, Minnesota cannot rebut the presumption of unconstitutionality because HF 1606 lacks safeguards for regulating constitutionally protected speech and is accordingly not narrowly tailored. HF 1606 does not include a mental state requirement. In every instance that a strict liability regime for regulating speech has reached the Supreme Court, the Court has emphatically rejected it as incompatible with the First Amendment. *Counterman*, 600 U.S. at 75 (requiring recklessness for true threats); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994)

(applying canon of constitutional avoidance to establish *scienter* requirement for materials depicting minors); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974) (requiring proof of fault for private defamation plaintiffs); *Mishkin v. New York*, 383 U.S. 502, 511 (1966) (requiring proof of scienter for obscenity); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (requiring actual malice for defamation claims of public figures); *Smith*, 361 U.S. at 152.

And courts have continued to apply this foundational prohibition on strict liability for speech, even in the face of new technology. The Fourth Circuit recently affirmed an injunction against a state law that prohibited the sale of data regarding certain "Covered Persons," "regardless of whether the data broker had knowledge that the information related to Covered Persons." *Jackson v. Thomson Reuters Am. Corp.*, No. 25-2121, 2026 WL 3211190, at *5 (4th Cir. Oct. 27, 2026). The court reasoned, "When a restriction on speech creates liability without a knowledge requirement, speakers are understandably incentivized to engage in self-censorship to avoid inadvertently incurring liability." *Id.* Consequently, the court reasoned, the law was not narrowly tailored and failed strict scrutiny.

A strict liability regime for a third-party platform that helps create or host the content of others is particularly problematic, and several recent examples highlight why. Apple, for example, has policies against explicit content and deepfakes on its App Store. And despite its policies, apps continue to be available, often through

deceptive practices and active efforts to evade the App Store's policies.[17] In many instances, the applications employed a "bait-and-switch" tactic altering their content after passing initial review by the App Store.[18] Some apps even provided different interfaces — including one for creating NCII and other explicit content — based on how users arrived at the application to evade detection.[19] HF 1606, lacking a mental state, would impose liability on Apple for this behavior, regardless of its knowledge or efforts to prevent the creation of NCII on its platforms.[20] This imposition of liability on platforms regardless of their mental state will undoubtedly result in a significant chilling of speech. AI-generation platforms, faced with significant liability — a half million dollars "for each unlawful access, download, or use" — will opt to significantly curtail controversial and — especially — sexual speech that is not even ostensibly covered by HF 1606.

---

[17] Vittoria Elliot & Matt Burgess, *Meta Ran Ads for an App That Promised to Nudify Female Politicians*, Wired (Aug. 18, 2026), https://perma.cc/K5R8-SJSQ.

[18] Matt Burgess, *Hundreds of Mundane AI Apps Are Hiding Sexually Abusive Deepfake Features*, Wired (Nov. 2, 2026), https://perma.cc/6PLA-NREC.

[19] *Id.*

[20] Although HF 1606 is nominally targeted at AI platforms that engage in the creation of deepfakes, the two prohibitions in the law extend more broadly. First, it prohibits any "website, application, software, program, or other service" from allowing users "to access, download, or use the website, application, software, program, or other service to nudify an image or video." HF 1606, subdiv. 2(a)(1). Second it prohibits a website or service from "nudify[ing] an image or video on behalf of a user." *Id.* subdiv. 2(a)(2). Consequently, the first prohibition must reach more conduct or speech than merely nudifying an image, which would be covered by the second prohibition; one reading is that the first prohibition reaches making nudification technology available to users.

HF 1606 also is overbroad in scope because it has no consent element whatsoever, despite seeking to address *non*-consensual intimate imagery. As described above, the law would sweep in self-generated imagery or images made in film and fashion studios with models' and actors' consent. Perhaps Minnesota could constitutionally proscribe AI-generated images of individuals in underwear or bikinis *without their consent*,[21] but that is not what the legislature did.

The omissions of crucial safeguards are compounded by HF 1606's definition of "intimate parts." It draws the key definition of "intimate parts" from Minnesota's existing law prohibiting "sexual contact" and sexual misconduct. Minn. Stat. § 609.343. The existing "sexual contact" statute defines an intimate part broadly as "the primary genital area, groin, inner thigh, buttocks, or breast of a human being." Minn. Stat. § 609.341, subdiv. 5 (incorporated in HF 1606). Combined with HF 1606's lack of a mental state or consent requirement, the law would sweep in depictions that are not ordinarily considered "intimate," such as depictions of shirtless men or self-generated content. As the Supreme Courts of Vermont and Minnesota observed, "In the constellation of privacy interests, it is difficult to imagine something more private than images depicting an individual engaging in sexual conduct, or of a person's genitals, anus, or pubic area, that the person has not

[21] Matt Burgess & Maddy Varner, *Grok Is Pushing AI 'Undressing' Mainstream*, Wired (Jan. 6, 2026), https://perma.cc/V4KC-89FJ.

consented to sharing publicly." *State v. VanBuren*, 214 A.3d 791, 810 (Vt. 2019); *State v. Casillas*, 952 N.W.2d 629, 642 (Minn. 2020) (quoting *Van Buren*, 214 A.3d at 810). But HF 1606 sweeps beyond that core privacy interest.

The Supreme Court has similarly rebuffed regulations of nudity that sweep beyond the government's asserted interest. In *Erznoznik v. City of Jacksonville*, the city had prohibited drive-in movie theaters from exhibiting any film depicting "the human male or female bare buttocks, human female bare breasts, or human bare [pubic] areas." 422 U.S. at 207. The city asserted, among other things, that the prohibition advanced its interest in protecting children. *Id.* at 212. The Court rejected that justification, as the proscribed nudity was "broader than permissible." *Id.* at 213. The ordinance "sweepingly [forbade] display of all films containing any uncovered buttocks or breasts, irrespective of context or pervasiveness." Thus, the Court, reasoned, the law "would bar a film containing a picture of a baby's buttocks, the nude body of a war victim, or scenes from a culture in which nudity is indigenous. The ordinance also might prohibit newsreel scenes of the opening of an art exhibit as well as shots of bathers on a beach." *Id.* Because the ordinance exceeded the city's interest in protecting children, it was invalid.

Consequently, HF 1606 will chill constitutionally protected speech online due to both its strict liability regime and its broad scope. The law's lack of a mental state requirement means that platforms might be held liable based on the judgment of

enforcers over debatable categories of proscribed speech. It would subject AI platforms and (indirectly) the speakers that use them to an almost unbounded range of objections to "sexualized" speech. HF 1606 consequently cannot survive strict scrutiny.

### C. A Less Restrictive Alternative Would At Least Include a Mental State, Exempt Consensual Imagery and Exempt Imagery in the Public Interest.

Although HF 1606 fails strict scrutiny, Minnesota and other states are not left without constitutionally permissible tools to regulate NCII. HF 1606 is not narrowly tailored because of the net effect of its multiple omitted safeguards. Like existing, constitutional NCII statutes, a revised HF 1606 could potentially survive constitutional scrutiny by including a mental state, scoping the definition of "intimate parts" to the government's interest, establishing a consent element, and exempting matters of public interest.

These safeguards are interrelated. Ensuring the bill as a whole is narrowly tailored may require more robust safeguards in some provisions if other provisions more broadly cover protected speech. For example: although the Supreme Court has suggested that regulations of speech must include a mental state of at least reckless disregard, a higher standard is demanded in certain contexts to ensure the prohibition "would not bleed over, either directly or through a chilling effect, to dissenting political speech at the First Amendment's core." *Counterman*, 600 U.S. at 81.

Critically, requiring a mental state of at least reckless disregard (or higher) will still leave prosecutors and survivors ample avenues to hold platforms accountable. Evidence of reckless disregard — or even knowledge or intent — has been central in several prominent examples of NCII creation and distribution: running ads promising to deepfake women (and female politicians in particular);[22] providing a separate, distinct interface for creating NCII;[23] receiving significant numbers of prompts for nudified images;[24] marketing the platforms as "unrestricted" or "uncensored";[25] hosting a "marketplace" for "NSFW" images;[26] and providing human models for face swapping and nudification.[27]

---

[22] Vittoria Elliot & Matt Burgess, *Meta Ran Ads for an App That Promised to Nudify Female Politicians*, Wired (Aug. 18, 2026), https://perma.cc/K5R8-SJSQ. *But see* Rebecca Umbach et al., *AI-Generated Image-Based Sexual Abuse: Perpetration and Consumption Across Three Regions*, 179 Computers in Human Behavior 108935 (2026), https://perma.cc/7EHY-9432 ("[W]e also found that perpetrators of [AI-generated image-based sexual assault] were more likely to report that the target was a man compared to a woman.").

[23] Matt Burgess, *Hundreds of Mundane AI Apps Are Hiding Sexually Abusive Deepfake Features*, Wired (Nov. 2, 2026), https://perma.cc/6PLA-NREC.

[24] Matt Burgess, *An AI Image Generator's Exposed Database Reveals What People Really Used It For*, Wired (Mar. 31, 2025), https://perma.cc/NVR5-A2HF.

[25] *Id.*

[26] *Id.*

[27] *Id.*; Matt Burgess, *Hugging Face Has a Deepfake Nudes Problem*, Wired (July 28, 2026), https://perma.cc/6SDL-BAHY ("[T]here are still dozens of AI models on the platform that name real people and allow others to create images of them. In sample files . . . there are 'suggestive' poses that indicate how the models could potentially be used.")

## III. FIRST AMENDMENT HARMS ARE NOT REPARABLE, EVEN FOR COMMERCIAL SPEAKERS.

Finally, the district court denied xAI's motion for a preliminary injunction on the grounds that "commercial injury" does not constitute irreparable harm and that "a violation of the First Amendment alone" cannot constitute an irreparable injury. App.300; R. Doc. 54, at 10.

Despite the district court's conclusion, xAI and other speakers using AI tools are suffering irreparable harm as a result of HF 1606. "It is well-settled law that a 'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Phelps-Roper v. Nixon*, 509 F.3d 480, 484–85 (8th Cir. 2007) (quoting *Elrod*, 427 U.S. 373). Thus, if a plaintiff "can establish a substantial likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation." *Id.* at 485 (citations omitted).

In this case, xAI and the speakers who use it are suffering irreparable harm to their First Amendment rights due to HF 1606's overbroad penalization of speech, without regard to consent, matters of public interest, or the platform's mental state. The ongoing infringement of the service's and users' First Amendment rights constitutes irreparable harm.

But even considering *only* monetary harm, the district court erred. The district court acknowledges that xAI has expended engineering and moderation time to

comply with HF 1606 and that "any associated cost will not be compensable by the State if the law is invalidated." Such a recovery is likely barred by sovereign immunity, App.241; R. Doc. 45, at 35, and the application of sovereign immunity to bar the recovery of damages also constitutes irreparable harm as a matter of law. *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994); *Chu Drua Cha v. Noot*, 696 F.2d 594, 600 (8th Cir. 1982).

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's denial of a preliminary injunction and remand for further proceedings.

Dated: November 12, 2026

Respectfully submitted,

*/s/ Cody Venzke*

Cody Venzke
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th St. NW
Washington, DC 20005
Tel.: (202) 715-0816
Email: cvenzke@aclu.org

Teresa Nelson
AMERICAN CIVIL LIBERTIES UNION OF MINNESOTA
P.O. Box 14720
Minneapolis, MN 55414
Tel.: (651) 645-4097
Email: tnelson@aclu-mn.org

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify as follows:

1. This Brief of Amici Curiae in Support of Plaintiff–Appellant and Reversal complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,453 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman, using the word-processing system Microsoft Word 2010.

Dated: November 12, 2026

By: */s/ Cody Venzke*
Cody Venzke

*Counsel for Amici Curiae*

## CERTIFICATION OF COMPLIANCE WITH EIGHTH CIRCUIT RULE 28A(H)

Pursuant to Local Rule 28A(h), I hereby certify that the electronic version of this Brief of Amici Curiae in Support of Plaintiffs-Appellees has been scanned for viruses using Windows Security anti-virus (version 1.435.67.0) and no virus was detected.

Dated: November 12, 2026

By: */s/ Cody Venzke*
Cody Venzke

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system on November 12, 2026.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: November 12, 2026

By: */s/ Cody Venzke*
Cody Venzke

*Counsel for Amici Curiae*